**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**B.D.G., Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 21, 2008.
Filed Oct. 7, 2008.

Scott A. Herlands, Scranton, for appellant.

Jason J. Legg, Asst. Dist. Atty., for Com., appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, BENDER, BOWES, GANTMAN, PANELLA, DONOHUE, and ALLEN, JJ.

OPINION BY ORIE MELVIN, J.:

¶ 1 In this appeal we consider whether the trial court abused its discretion in ordering Appellant, B.D.G., to make restitution in the amount of $29,439.00 pursuant to the Juvenile Act. 42 Pa.C.S.A. §§ 6301–6365. After review, we affirm.

¶ 2 The factual and procedural background of this juvenile proceeding may be summarized as follows. On December 12, 2004, Appellant, then 17 years old, was driving a Jaguar owned by his father and his father's company. While proceeding westbound on State Route 106 in Susquehanna County he approached another vehicle ahead of him also in the westbound lane. Appellant attempted to pass this vehicle by crossing over the double yellow line and into the eastbound lane at a curve in the roadway marked as a no passing zone. There he collided head on with an oncoming vehicle driven by Lornah Schulte. Ms. Schulte died as a result of her injuries, and the two passengers in her vehicle, her mother, Constance Schulte, and a family friend, Emily Socha, were seriously injured.

¶ 3 As a result of the investigation into the accident, the Commonwealth filed a delinquency petition against Appellant alleging the commission of the following delinquent acts: one count of homicide by motor vehicle, a felony of the third degree, under 75 Pa.C.S.A. § 3732(a); three counts of recklessly endangering another person (REAP), a misdemeanor of the second degree, under 18 Pa.C.S.A. § 2705; and six summary Vehicle Code violations. On August 1, 2005, Appellant entered into a plea agreement whereupon Appellant was adjudicated delinquent based upon his

admission that he committed three counts of REAP (one for each of the victims), and he was ordered to be placed in Youth Services Agency for twenty-nine days, complete 100 hours of community service, write a letter of apology to the victims, and make restitution to the victims in an amount to be determined at a later date. A license suspension for a minimum of 18 months was also ordered. No appeal was taken from the August 1st dispositional order.

¶ 4 Ultimately, after discussing the matter with the District Attorney's Office, only Ms. Socha decided to seek restitution. On February 22, 2006, a restitution hearing was held wherein Lisa Vail, Appellant's Juvenile Probation Officer, Emily Socha, one of the victims, Kimberly Long, Ms. Socha's mother, Appellant, and his father, G.G., all testified. Ms. Vail testified that she had been supervising the juvenile for approximately 6 months. N.T. Restitution Hearing, 2/22/06, at 3. During the supervision, the juvenile was doing "very well" while attending his senior year of high school, was an excellent student and was accepted to attend the University of Scranton and was looking into other colleges. *Id.* at 3–4. She further testified that the juvenile had worked as a lifeguard and, after leaving that job, he was looking for other employment. *Id.* at 4. Ms. Vail also indicated that she was not aware of the juvenile having any impediments to obtaining and maintaining employment or any mental or physical limitations. *Id.* at 4–5.

¶ 5 Emily Socha testified that she suffered serious injuries that required hospitalization for four weeks after the accident, which resulted in substantial medical bills. Ms. Socha further testified that at the time of the hearing she was still experiencing physical difficulties as a result of her injuries in that her vision was poor as she could not see out of her left eye and she had a steel rod placed in her arm and that she continued to have difficulty with her strength in that arm. *Id.* at 11–12. Ms. Socha also indicated that the injury to her head resulted in medical restrictions that advised her to avoid any activities that risk contact to her skull for at least two more years. Despite her injuries, Ms. Socha was able to obtain employment at a local restaurant as a waitress earning $2.50 per hour plus tips. Ms. Socha also indicated that she was not presently attending college but had completed one semester before dropping out. *Id.* at 20–21.

¶ 6 She further indicated that the Department of Public Welfare (DPW) paid for most of her medical bills and placed a lien upon any civil recovery she might obtain. Also evidence was presented that the amount of the juvenile's insurance coverage was divided among the three victims, and Ms. Socha only received $100,000 in the civil settlement. *Id.* at 13. As part of that settlement, she had to pay $26,635.00 to satisfy DPW's lien and after paying her attorney fees, Ms. Socha testified that she received around $50,000 from the civil settlement. In addition, Ms. Socha also testified that there were other medical bills that were inadvertently not paid and that she was still being billed for them in the total amount of $2,804.00. *Id.* at 14–15.

¶ 7 Appellant testified that he was accepted to the University of Scranton and desired to attend college but would require student loans to do so and believed that he would not be able to obtain the necessary loans if ordered to pay restitution. However, he admitted that he had not even applied for any financial aid or completed his financial aid packet. *Id.* at 34. He further admitted that he had a cumulative average of 89 during his first marking period of his senior year but then contended that his grades were lower in the sec-

ond marking period. *Id.* at 27–28. Appellant testified that he received a score of 1620 on his SAT and also applied to colleges in Florida and North Carolina but did not apply to any state-owned colleges in Pennsylvania, and he "didn't know" that a state-owned school would be substantially less expensive than a private school. *Id.* at 35–36. Appellant testified that he earned $6 per hour while he was working as a lifeguard. *Id.* at 33. His life guarding job ended because he had "differences with the boss." *Id.* at 37.

¶ 8 When questioned about his health, Appellant indicated that he was feeling "okay." *Id.* at 31. Appellant further explained that he suffered some torn cartilage in his one knee as a result of the accident. Despite his knee injury, Appellant was a member of his high school track and field team and participated in the hurdle event until he realized that his knee was too bad to continue. *Id.* at 32–33. Further the injury to his knee did not require him to wear any special braces, and there was no need for any physical therapy. *Id.* at 37. When given the option to have surgery to repair the damage to his knee, Appellant indicated that he opted out of any surgery because he was afraid. *Id.* at 38. It was also learned that Appellant was remorseful and had received counseling.

¶ 9 Appellant's father testified that at the time of the hearing he was working part-time at JCPenney earning $6.00 per hour, the financial position of his family was poor, and due to his own medical bills of about $10,000 to $12,000 he was contemplating filing for bankruptcy. *Id.* at 39, 45. Appellant's father indicated that he was previously employed as the national sales manager for a pharmaceutical marketing company but was fired shortly after the accident. Further, that despite his background in sales he has not been able to obtain a similar job. *Id.* at 42–43. He further testified that Appellant had changed after the accident. *Id.* at 40. As to helping with paying for college, he indicated that he could not afford to help and that he had paid for his own college education by borrowing money and expected his son to do the same. *Id.* at 41. Appellant's father was also of the belief that his son would be unable to obtain student loans in the event that he was ordered to pay restitution. *Id.*

¶ 10 At the conclusion of the hearing, the trial court entered an order directing Appellant to pay restitution to Ms. Socha in the amount of $29,439.00 (the amount of the reimbursement to DPW plus the amount of post-settlement medical expenses). Appellant filed a timely notice of appeal from the order on March 9, 2006.[1]

¶ 11 Appellant frames the questions for our review as follows:

1. Whether the [trial] [c]ourt erred when it awarded [r]estitution by not taking into account the then juvenile's earning capacity and rehabilitative needs, nature of the offense, and the victim's current circumstances?

2. Whether the [trial] [c]ourt erred in determining civil liability and/or securing satisfaction of civil damages in awarding in excess of $29,000.00 against the then juvenile in a juvenile proceeding?

Appellant's Substitution Brief, at 3.

∎ ¶ 12 Our standard of review of dispositional orders in juvenile proceedings is well settled. "The Juvenile Act grants broad discretion to the court when determining an appropriate disposition. We will not disturb a disposition absent a man-

1. Both Appellant and the trial court have complied with Pa.R.A.P.1925.

ifest abuse of discretion." *In re R.D.R.*, 876 A.2d 1009, 1013 (Pa.Super.2005) (internal citation omitted). Moreover, "[a] petition alleging that a child is delinquent must be disposed of in accordance with the Juvenile Act. Dispositions which are not set forth in the Act are beyond the power of the juvenile court." *In re J.J.*, 848 A.2d 1014, 1016–1017 (Pa.Super.2004) (citation omitted).

Further, one of the purposes of the Juvenile Act is to hold children accountable for their behavior. Accordingly, the Juvenile Act authorizes the court to "order[ ] payment by the child of reasonable amounts of money as fines, costs or restitution as deemed appropriate as part of the plan of rehabilitation concerning the nature of the acts committed and the earning capacity of the child." 42 Pa.C.S.A. § 6352, Disposition of delinquent child, (a) General rule.-(5). Consistent with the protection of the public interest and the community, the rehabilitative purpose of the Juvenile Act is attained through accountability and the development of personal qualities that will enable the juvenile offender to become a responsible and productive member of the community. Thus, the policies underlying the Juvenile Act and its restitution provision, as well as the plain language of Section 6352, serve to invest the juvenile court with a broad measure of discretion to apportion responsibility for damages based upon the nature of the delinquent act and the earning capacity of the juvenile. *In re M.W.*, 555 Pa. 505, 512–513, 725 A.2d 729, 732–733 (1999).

*Appeal of B.T.C.*, 868 A.2d 1203, 1204–1205 (Pa.Super.2005). In reviewing an order of restitution, discretion is abused where the order is speculative or excessive or lacks support in the record. *In Interest of Dublinski*, 695 A.2d 827, 829 (Pa.Super.1997) (citing *Commonwealth v. Fuqua*, 267 Pa.Super. 504, 407 A.2d 24, 27 (1979)).

¶ 13 Appellant first contends that the trial court abused its discretion in awarding restitution in any amount "by not taking into account the then juvenile's earning capacity, nature of the offense and the victim's current circumstances." Appellant's Substitution Brief, at 7. He further argues that the trial court failed to consider his rehabilitative needs. *Id.* at 8.

¶ 14 In the case of *Dublinski, supra*, a panel of this Court found the principles espoused by our criminal law jurisprudence as it relates to an award of restitution were equally applicable in the juvenile context. Specifically, the *Dublinski* panel held that in fashioning a restitution award the juvenile court must consider the following four factors: "(1) The amount of loss suffered by the victim; (2) The fact that defendant's action caused the injury; (3) The amount awarded does not exceed defendant's ability to pay; [and] (4) The type of payment that will best serve the needs of the victim and the capabilities of the defendant." *Id.* at 829. (quoting *Commonwealth v. Valent*, 317 Pa.Super. 145, 463 A.2d 1127, 1128 (1983) (citing *Commonwealth v. Wood*, 300 Pa.Super. 463, 446 A.2d 948, 949 (1982) and *Fuqua, supra* ); *see also*, 18 Pa.C.S.A. § 1106(c)(2) (listing similar requirements).

¶ 15 Further, the *Dublinski* panel explicated that with respect to the second factor the court should engage in a "but for" analysis, *i.e.*, "[the juvenile] will be liable for restitution for all damages which would not have occurred but for [the juvenile's] criminal conduct." *Dublinski, supra*, at 830. As to the third factor, a juvenile's earning capacity can be determined by examining relevant factors such as:

[the juvenile's] mental ability, maturity and education; [ ] work history, if any;

the likelihood of [ ] future employment and extent to which [the juvenile] can reasonably meet a restitution obligation; the impact of a restitution award on [the juvenile's] ability to acquire higher education and thus increase [the juvenile's] earning capacity; and [the juvenile's] present ability to make restitution.

*Id.* In terms of the fourth factor, which concerns the type of payment that will best serve the needs of the victim and the rehabilitative needs of the juvenile, the *Dublinski* panel noted that "[s]hould the court determine that [the juvenile] has no present ability to pay restitution ... the court may defer imposition of a payment plan until an appropriate time in the future." We agree with the *Dublinski* panel's cogent analysis in determining the amount and method of payment for juvenile restitution orders.

◼ ¶ 16 Clearly, the juvenile court has the statutory authority to order restitution and enjoys broad discretion when deciding whether to impose restitution as part of the overall goal of apportioning responsibility and accountability, subject to the child's ability to pay. *In re M.W., supra.* In applying the factors outlined above, we find that the record supports the trial court's restitution award. Instantly, Appellant was adjudicated delinquent following a hearing wherein he entered into a plea agreement admitting to the acts that constituted the crime of REAP and which caused one death and serious injuries to two other victims. The only victim seeking restitution provided evidence of her medical bills, the amount of which was not disputed. Thus, there can be no dispute that the record supports a finding as to factors one and two: the amount of loss and its causal relationship to the juvenile's conduct. As such, Appellant's argument that his conduct was not intentional and

thus did not warrant restitution is unavailing as it does not relieve him of responsibility for restitution should the court find that his actions, whether intentional or reckless, had a causal relationship to the loss suffered by the victim and warrant restitution as part of the rehabilitative plan.

¶ 17 The central argument advanced by Appellant concerns factor number three. Appellant maintains that his "earning capacity is, at best, as a minimum wage laborer [and] he may never be able to be employed due to his ongoing therapy and counseling." Appellant's Substitution Brief, at 9. Further, that his "mental ability, maturity and education is suspect. His work history is nil ... [and] prospects of future employment dim." *Id.* Based upon nothing more than his belief that he will be ineligible to receive student aid loans if he has a judgment against him, he contends that his "desire to better himself and go to college will be quashed if this money award is allowed to stand." *Id.* Thus, he submits that the amount awarded exceeds his ability to pay.

¶ 18 We find Appellant's claims are belied by the record. Furthermore, his true argument is not that the trial court failed to take into consideration the requisite factors but rather that the court failed to accept his self-serving assessment of his situation and weigh the evidence in his favor. It is apparent from a review of the record that the juvenile court balanced the necessary factors in fashioning a disposition appropriate for Appellant. In ordering the restitution, the juvenile court considered "the nature of the acts committed and the earning capacity of the [juvenile]," 42 Pa.C.S.A. § 6352(a)(5), Appellant's anticipated ability to pay, as well as parental liability.[2]

¶ 19 Specifically, the court noted:

2. We note the trial court's order also held the      parents jointly liable for the payment of resti-

Through his actions, BDG has caused the death of one individual and severely injured two others. Specifically, Ms. Socha cannot see out of her left eye, has a metal rod in one of her arms, and must somehow avoid hitting her head for the next two years, in order to prevent further injury.

BDG must be made to understand his responsibility for these terrible events. Under the rehabilitative scheme of the Juvenile Act, restitution will aid in this effort. 42 Pa.C.S. § 6352(a)(5). Although he is not employed at the moment, BDG's testimony reveals he is physically capable of work. Since the accident, he has worked for a time as a lifeguard and participated in his high school's track team. He does have some problems with one of his knees as a result of the accident, but nothing comparable to Ms. Socha's injuries, and Ms. Socha currently holds down a job as a waitress.

* * * *

[While] a restitution order might decrease a juvenile offender's earning capacity by affecting his or her ability to attend college[,][i]t does not forbid a court from ordering restitution in such situations, but only requires that the amount of restitution ordered should reflect this fact. In the present situation, the court is confident BDG, even with a minimum wage job and no college degree, will be able to make restitution in full in a timely fashion.... A multitude of options are available in our society for a young person who wishes to attend college. BDG should explore these options if he wishes to further his education after high school.

tution. Order of August 1, 2005, C.R. at 4–2. Appellant does not challenge this portion of

Trial Court Opinion, filed 4/18/06, at 3–4 (citations to the record omitted); Certified Record (C.R.), at 19–4. Additionally, the following colloquy took place at the hearing between Appellant's counsel and the court:

ATTORNEY HERLANDS: Let me just say for the record that you must take into account his earning capacity.

THE COURT: Absolutely. He's 18 years old and he's probably got another 60 years to live. He certainly has an earning capacity, at least of $5.25 an hour or whatever the minimum wage is today—at least.

ATTORNEY HERLANDS: I agree with you—a minimum wage, that's what we're looking at.

THE COURT: At a minimum.

N.T. Hearing, 2/22/06, at 9. Clearly, the record refutes Appellant's contention that the court failed to take "into account the then juvenile's earning capacity, nature of the offense and the victim's current circumstances." Appellant's Substitution Brief, at 7.

¶ 20 Appellant makes much of his claim that he has no present ability to pay; such a circumstance is the norm when dealing with a juvenile and cannot serve as a disqualifying factor or else the court's ability to award restitution would cease to exist in the vast majority of the cases. It is important to note that Appellant was not ordered to pay the award in a lump sum but through an installment plan. Given that Appellant was eighteen years old at the time of the hearing and the trial court determined that he was an able-bodied, intelligent, young man capable of securing employment, there was no abuse of discretion in fashioning an award that required the order on appeal.

payments over a long period of time. In fact, this type of payment is specifically provided for under the Juvenile Act. *See* 42 Pa.C.S.A. § 6352(a)(5) (authorizing a court to retain jurisdiction over a juvenile who has been ordered to pay restitution until paid off or the minor reaches age 21. If the restitution remains unpaid once the minor reaches age 21, the order "shall continue to be collectible" as a judgment in favor of the county probation department under the Sentencing Code pursuant to § 9728(a) relating to collection of restitution, court costs, fines and penalties). Moreover, a perpetrator may well have to make substantial sacrifices in order to make restitution to the victims of his crime thereby serving the true rehabilitative purpose of restitution. *Commonwealth v. Wood, supra.*

¶ 21 Furthermore, this Court has previously upheld a similar payment plan and rejected similar contentions that the trial court failed to consider the juvenile's ability to pay restitution or that it ignored the nature of his crime in setting restitution. In the case of *In the Interest of J.E.D.*, 879 A.2d 288 (Pa.Super.2005), *appeal denied*, 586 Pa. 713, 889 A.2d 1216 (2005), the juvenile appealed from the order requiring him to pay $19,377.95 in restitution for medical bills incurred by the victim following his adjudication of delinquency for the offense of simple assault. In affirming the order, we quoted with approval the rationale offered by the trial court as follows:

> The $19,377.95 ordered as restitution, although a substantial amount for a [seventeen]-year-old, may be paid off over a period of years.... As long as the amount of restitution is related to the harm suffered by the victim, [the Juvenile Act in conjunction with the Sentencing Code] permit the court to set a monetary amount that, although it may be currently [non]payable in a lump sum, may be paid off over time.

In *Dublinski*, the court stated that if a juvenile defendant does not have the present ability to pay restitution, the court may defer imposition of payment until an appropriate time in the future. The court reasoned that: 'There is no rule of law which holds that a defendant can be ordered to make restitution only if he has a present financial ability to make immediate restitution.' *Id.*

Thus, the fact that [Appellant] does not have the present ability to pay the ordered amount of restitution does not relieve [Appellant] of paying that amount. He is an able-bodied young man who has the ability to earn money. [Appellant] may pay off his debt when he begins working.

Having [Appellant] pay the restitution amount over a period of time will increase the likelihood that it is paid. As [Appellant] is unable to pay the amount immediately, paying over a period of years will ensure that he is able to pay, and this method ensures that the victim will be compensated.

*Id.* at 292.

¶ 22 Based on the foregoing, we discern no abuse of discretion by the trial court. The trial court's disposition appropriately took into account the rehabilitative needs of Appellant, his accountability for his actions, and the development of personal qualities that will enable Appellant to become a responsible and productive member of the community. We perceive no manifest abuse of discretion which would cause us to disturb its order.

■ ¶ 23 We turn to Appellant's remaining issue, wherein he presents two arguments as to why the restitution order was improper. First, he asserts that it constitutes the satisfaction of a civil award of damages and as such serves only to punish him in contravention of the purpose

of juvenile proceedings. Appellant cites to *In re Garman*, 250 Pa.Super. 54, 378 A.2d 449 (1977); and *In Interest of Frey*, 248 Pa.Super. 322, 375 A.2d 118 (1977), to support his position. However, *Garman* and *Frey* applied the former version of the Juvenile Act, 11 P.S. §§ 50–101 *et seq.* (Supp.1977), in holding that no provisions are found in the Juvenile Act itself authorizing the court to require the juvenile to make restitution. The current version now provides for such a disposition. Thus, *Garman* and *Frey* are clearly inapplicable. Furthermore, we rejected a similar argument in *Appeal of B.T.C., supra.*

¶ 24 In *B.T.C.*, a juvenile was adjudicated delinquent of homicide by vehicle, reckless driving and other offenses after he lost control of his vehicle and collided with another car, killing both occupants. The court ordered the juvenile to pay restitution of $17,188.80 to cover the victims' funeral expenses. On appeal, the juvenile contended that the imposition of restitution was unlawful because it was duplicative of monies already paid to the victims' family through a civil settlement. We rejected this argument by adopting the reasoning noted in *Commonwealth v. Kerr*, 298 Pa.Super. 257, 444 A.2d 758 (1982):

> an order of restitution is not an award of damages. While the order aids the victim, its **true purpose,** and the **reason** for its imposition, is the rehabilitative goal it serves by impressing upon the offender the loss he has caused and his responsibility to repair the loss as far as it is possible to do so.

*Kerr*, 444 A.2d at 760 (citations omitted) (emphasis in original). Here, B.T.C.'s actions resulted in the deaths of two innocent people; it was well within the discretion of the trial court to find that a rehabilitative goal was served by making B.T.C. make restitution for the costs of

their funerals. The mere fact that B.T.C.'s parents' insurance company paid damages to the victims' family does not serve to make the restitution order unlawful. Further, as we held in *Kerr*, the issue of the insurance company's right of subrogation has no bearing on the validity of the restitution order. *Id.* at 760–61. Accordingly, we find that B.T.C.'s claim that the order of restitution was unlawful because it was duplicative of monies already paid to the victims' family through a civil settlement lacks merit.

*Id.*, 868 A.2d at 1205–1206. Moreover, the Crimes Code provision dealing with restitution, even though it is not directly applicable to the situation in the case at bar, suggests the same result. *See* 18 Pa. C.S.A. § 1106(c)(1)(i) (stating "The court shall not reduce a restitution award by any amount that the victim has received from an insurance company."). Thus, we find no merit to this claim.

¶ 25 Further, Appellant contends that the victim's execution of a general release when she settled with his parents' insurance carrier forever discharged and released him from any further liability and/or claims.

¶ 26 Initially, we note that Appellant has failed to cite to any authority supporting this contention, and, thus, we find this claim waived. In an appellate brief, parties must provide an argument as to each question, which should include a discussion and citation of pertinent authorities. Pa.R.A.P. 2119(a), 42 Pa.C.S.A. This Court is neither obliged, nor even particularly equipped, to develop an argument for a party. *Commonwealth v. Williams*, 566 Pa. 553, 577, 782 A.2d 517, 532 (2001) (Castille, J., concurring). To do so places the Court in the conflicting roles of advocate and neutral arbiter. *Id.* When an appellant fails to develop his issue in an

argument and fails to cite any legal authority, the issue is waived. *Commonwealth v. Luktisch,* 451 Pa.Super. 500, 680 A.2d 877, 879 (1996). In Appellant's brief, while he baldly asserts that the victim's execution of a general release in accepting settlement with his parents' insurance carrier bars the instant restitution order, he entirely fails to cite any legal authority to support his claim. It is not the job of this Court to clarify or support Appellant's arguments. We, therefore, find this claim to be waived.

¶ 27 Moreover, we note that said release has not been included in the certified record. Thus, we can only repeat the well established principle that "our review is limited to those facts which are contained in the certified record" and what is not contained in the certified record "does not exist for purposes of our review." *Commonwealth v. O'Black,* 897 A.2d 1234, 1240 (Pa.Super.2006). As this Court thoroughly summarized in *Commonwealth v. Preston,* 904 A.2d 1 (Pa.Super.2006) (*en banc*), *appeal denied,* 591 Pa. 663, 916 A.2d 632 (2007):

> The fundamental tool for appellate review is the official record of the events that occurred in the trial court.

> \* \* \* \*

> This Court cannot meaningfully review claims raised on appeal unless we are provided with a full and complete certified record. This requirement is not a mere 'technicality' nor is this a question of whether we are empowered to complain *sua sponte* of lacunae in the record. In the absence of an adequate certified record, there is no support for an appellant's arguments and, thus, there is no basis on which relief could be granted.

> The certified record consists of the 'original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court.' Pa.R.A.P.1921. Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty. To facilitate an appellant's ability to comply with this requirement, our Supreme Court adopted the following procedural rule effective as of June 1, 2004:

> > The clerk of the lower court shall, at the time of the transmittal of the record to the appellate court, mail a copy of the list of record documents to all counsel of record, or if unrepresented by counsel, to the parties at the address they have provided to the clerk. The clerk shall note on the docket the giving of such notice.

> Pa.R.A.P.1931(d). As the explanatory comment to Rule 1931 indicates, if counsel (or a party) discovers that anything material has been omitted from the certified record, the omission can be corrected pursuant to the provisions of Rule of Appellate Procedure 1926. Under Rule 1926, an appellate court may direct that an omission or misstatement shall be corrected through the filing of a supplemental certified record. However, this does not alter the fact that the ultimate responsibility of ensuring that the transmitted record is complete rests squarely upon the appellant and not upon the appellate courts. Pa.R.A.P. 1931.

> \* \* \* \*

> In the absence of specific indicators that a relevant document exists but was inadvertently omitted from the certified record, it is not incumbent upon this Court

to expend time, effort and manpower scouting around judicial chambers or the various prothonotaries' offices of the courts of common pleas for the purpose of unearthing transcripts, exhibits ... If, however, a copy of a document has been placed into the reproduced record, or if notes of testimony are cited specifically by the parties or are listed in the record inventory certified to this Court, then we have reason to believe that such evidence exists. In this type of situation, we might well make an informal inquiry to see if there was an error in transmitting the certified record to this Court. We might also formally remand the matter to the trial court to ascertain whether notes of testimony or other documentation can be located and transmitted. If a remand is necessary, it is appropriate to direct the trial court to determine why the necessary documentation was omitted from the certified record. An appellant should not be denied appellate review if the failure to transmit the entire record was caused by an "extraordinary breakdown in the judicial process." However, if the appellant caused a delay or other problems in transmitting the certified record, then he or she is not entitled to relief and the judgment of the court below should be affirmed.

*Id.* at 6–8 (select internal citations omitted).

¶ 28 Here, the certified record on appeal does not contain the release in question or any of the exhibits from the restitution hearing held February 22, 2006. Nor did Appellant even file a reproduced record, and, a copy does not appear in the reproduced record filed by the Commonwealth. Furthermore, the list of record documents transmitted pursuant to Pa.R.A.P.1931(d) and served on Appellant's counsel does not contain a notation for any exhibits. As we find that our review is hampered by our inability to review the terms of this release and that Appellant through his own error has failed to provide us with it, this claim has been waived for this reason as well. *See Commonwealth v. Gillen,* 798 A.2d 225, 229 (Pa.Super.2002) (noting that where confusion exists as to where the fault lies for a missing transcript, it is appropriate to remand for an evidentiary hearing regarding the same but also affirming the trial court's factual finding that the fault lay with appellant's counsel in submitting a transcription request that failed to adequately specify transcription of the suppression hearing and thus deeming the suppression issue waived) and *Commonwealth v. Barge,* 560 Pa. 179, 743 A.2d 429, 429–30 (1999) (holding that if documents are missing from the certified record because of a default by court personnel, an appellant is entitled to have his claims resolved on the merits, but, if the absence of the evidence is attributable to the appellant's failure to comply with the relevant procedural rules, the claims will be deemed to have been waived).

■ ¶ 29 We further note that in the adult criminal context, this Court recently rejected a similar argument. *See Commonwealth v. Pleger,* 934 A.2d 715, 720–721 (Pa.Super.2007) (stating that the "victim could no more release the [defendant] from a potential sentence of restitution than from a potential sentence of incarceration or probation. All such matters are within the sentencing court's authority and duty. It was not for the victim to circumscribe the criminal court's powers or obligations. [Furthermore,] in determining what restitution was to be imposed as part of [defendant's] sentence, the general release and the settlement amount were irrelevant. Rather, the court was required, pursuant to the aforesaid statutes and caselaw, to consider fully the request for restitution presented by the district attor-

ney's office, to evaluate that request in a manner consistent with 18 Pa.C.S.A. § 1106 and 42 Pa.C.S.A. § 9721(c), to arrive at the full amount of restitution due, and then to issue an appropriate order requiring full restitution as an aspect of [defendant's] sentence."). Accordingly, even if not waived, we would find no merit to this claim.

¶ 30 Order affirmed.

¶ 31 FORD ELLIOTT, P.J., STEVENS, GANTMAN and DONOHUE, JJ., Join.

¶ 32 ALLEN, J. files a Dissenting Opinion in which BENDER, BOWES and PANELLA, JJ., join.

DISSENTING OPINION BY ALLEN, J.:

¶ 1 I respectfully dissent. In this case, the Department of Public Welfare ("DPW") originally paid the victim's medical expenses in the amount of $26,635. The victim then settled her civil claim against B.D.G., executing a settlement agreement and general release of her cause of action. Following settlement of the victim's civil claim against B.D.G., DPW was fully reimbursed, subrogating its expenditure from the victim's settlement amount pursuant to a statutory lien.[3] In a later juvenile proceeding, the trial court adjudicated B.D.G. delinquent and ordered him to pay $26,635 in restitution to the victim for medical expenses, based upon the sole fact that DPW subrogated this amount from the victim's settlement award. Hence, the trial court essentially found that the victim was entitled to an additional $26,635, free and clear, in an attempt to recompense the victim for monies that DPW rightfully subrogated. As a practical matter, the trial court's restitu-

tion order compensated the victim twice for identical medical expenses.

¶ 2 The dispositive issue in this case is whether 42 Pa.C.S. § 6352(a)(5) permits a trial court to enter an order of "restitution" that results in the unjust enrichment of the victim. Upon my review, I conclude that the plain language of 42 Pa.C.S. § 6352(a)(5) does not vest the trial court with the authority to enter a restitution order that provides the victim with double recovery for the same expenses. Therefore, from my perspective, the trial court imposed an illegal sentence when it ordered B.D.G. to pay $26,635 in medical expenses resulting in the unjust enrichment of the victim. Accordingly, I would vacate this portion of the trial court's order. Because the Majority declines to reach this result, I must dissent.

¶ 3 Following a car accident, B.D.G., a seventeen-year-old, entered into a plea agreement with the Commonwealth and was adjudicated delinquent for committing three counts of reckless endangerment. On August 1, 2005, the trial court suspended B.D.G.'s driver's license for eighteen months and ordered B.D.G. to be placed in a Youth Services Agency for twenty-nine days. The trial court further ordered B.D.G. to complete 100 hours of community service, write a letter of apology to the victims, and make restitution to the victims in an amount to be determined at a later date.

¶ 4 After conducting a hearing on February 22, 2006, the trial court ordered B.D.G. to pay a total of $29,439 in restitution to Emily Socha ("Socha"), one of the victims of the car accident. At the restitution hearing, Socha testified that a Commonwealth agency, DPW, paid $26,635 of

---

**3.** Under statute, DPW has a right to subrogate the medical expenses it paid from the victim's settlement amount through the imposition of a lien against the award. 62 P.S. § 1409(a)(7)(i).

her medical expenses. Socha later settled her civil claim against B.D.G., in exchange for $100,000, executing a general release of her entire cause of action. DPW then subrogated the $26,635 that it paid for Socha's medical expenses from Socha's settlement amount pursuant to a statutory lien. Although DPW originally paid Socha's medical bills and received reimbursement for its expenditure, the trial court ordered B.D.G. to pay restitution to Socha for subrogated medical expenses again in the amount of $26,635.

¶ 5 The trial court's restitution order thus represents the third time that Socha, directly or indirectly, will receive compensation for the same medical expenses. This time, however, Socha, upon receiving the $26,635, will be at liberty to spend it as she deems fit. Consequently, the trial court's restitution order took $26,635 in medical *expenses*—which Socha is no longer accountable for—and converted it into a *benefit*—an amount B.D.G. owes Socha for her unconditional use. To the extent the trial court ordered B.D.G. to pay $26,635 in medical expenses, I conclude that this amount constituted an illegal sentence because it resulted in the unjust enrichment of Socha. Consequently, I would vacate this portion of the trial court's order.[4]

¶ 6 On appeal to this Court, B.D.G. contends, *inter alia*, that the trial court erred in imposing restitution because its order effectively reimbursed Socha for monies that DPW rightfully subrogated from the settlement amount. Brief for Appellant at

12–13. After review, I conclude that the trial court's restitution order constituted an illegal sentence. A plain reading and interpretation of 42 Pa.C.S. § 6352(a)(5)'s term, "a reasonable amount of restitution," compels my conclusion.

¶ 7 "[A]n order of restitution must be based upon statutory authority." *In re M.W.*, 555 Pa. 505, 725 A.2d 729, 731–32 (1999). Where an appellant's challenge is directed to the trial court's authority to impose restitution, it implicates the legality of the sentence as opposed to the discretionary aspects of the sentence. *Id.* at 731 n. 4. "If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated." *Commonwealth v. Stevenson*, 850 A.2d 1268, 1271 (Pa.Super.2004) (*en banc*) (citation omitted). "Moreover, challenges to an illegal sentence can never be waived and may be reviewed *sua sponte* by this Court." *Commonwealth v. Randal*, 837 A.2d 1211, 1214 (Pa.Super.2003) (*en banc*) (citation and internal quotation marks omitted).

¶ 8 In the juvenile context, restitution awards are governed by 42 Pa.C.S. § 6352(a)(5), which provides in pertinent part:

(a) **GENERAL RULE.**—If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the public interest

4. After executing the settlement agreement, Socha incurred additional medical expenses in the amount of $2,804. In sharp contrast to the $26,635, Socha never received any form of compensation for these medical expenses and they were not paid by any source, including the settlement amount, an insurance company, and/or the DPW. Because the $2,804 in medical expenses represented Socha's out-of-pocket loss, and were not covered under the settlement agreement, I conclude that B.D.G. is obligated to pay Socha this amount in order to restore Socha to her original position had the accident not occurred; that is, B.D.G. must pay Socha for the outstanding expense that she has incurred. As such, I would affirm the trial court's order insofar as it directed B.D.G. to pay Socha $2,804 in medical expenses. My dissent is strictly limited to analyzing the $26,635 in medical expenses that were paid by DPW and later subrogated from Socha's settlement award.

and best suited to the child's treatment, supervision, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community:

\* \* \* \*

(5) Ordering payment by the child of **reasonable amounts** of money as fines, costs, fees or **restitution** as deemed appropriate as part of the plan of rehabilitation considering the nature of the acts committed and the earning capacity of the child, including a contribution to a restitution fund....

42 Pa.C.S. § 6352(a)(5) (emphasis added).

¶ 9 "Issues involving statutory interpretation present questions of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Leonberger*, 932 A.2d 218, 222 (Pa.Super.2007) (citation omitted). "In construing a statute to determine its meaning, courts must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words." *Id.* (citation omitted). Since there is a presumption that the General Assembly intended a statute to be effective, we must not read a section of a statute in isolation, but rather, should view it with reference to, and in light of, other sections of the statute. *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 439 (1994).

¶ 10 In *Commonwealth v. Genovese*, 450 Pa.Super. 105, 675 A.2d 331 (1996), this Court analyzed the concept of criminal restitution and defined the term "restitution" according to its ordinary legal and grammatical meaning:

Restitution ... is not a fine, but is an "equitable remedy under which a person is restored to his or her original position prior to loss or injury; [it is the] restoration of anything to its rightful owner [or] the act of making good or giving equivalent for any loss, damage or injury."

*Id.* at 333 (citing BLACK'S LAW DICTIONARY 1313 (6th ed.1990)). On a routine basis, this Court has expressly approved the common-sense definition of restitution, stating that "[t]he payment of restitution ordered by the court cannot be in excess of the damage caused by the defendant." *Commonwealth v. Pappas*, 845 A.2d 829, 842 (Pa.Super.2004). *See, e.g., Commonwealth v. Dohner*, 725 A.2d 822, 824 (Pa.Super.1999) ("The amount of a restitution order is limited by the loss or damages sustained as a direct result of defendant's criminal conduct and by the amount supported by the record."); *Commonwealth v. Gerulis*, 420 Pa.Super. 266, 616 A.2d 686, 698 (1992) (same); *Commonwealth v. Balisteri*, 329 Pa.Super. 148, 478 A.2d 5, 9 (1984) (same).

¶ 11 The above-mentioned interpretations of restitution are in accord with the definition found in a parallel provision of the Juvenile Act, 42 Pa.C.S. § 6352(a)(6), which permits the imposition of restitution "not in excess of actual damages caused by the child[.]" 42 Pa.C.S. § 6352(a)(6). Utilizing these definitions and/or conceptual descriptions of restitution, I conclude that "reasonable restitution," as that term exists in 42 Pa.C.S. § 6352(a)(5), cannot be construed as granting the trial court with the authority to enter an order that results in the double recovery of expenses.

¶ 12 It is the Commonwealth's burden to prove its entitlement to restitution. *See Commonwealth v. Boone*, 862 A.2d 639,

643 (Pa.Super.2004) (stating that the amount of restitution must be supported by the record and cannot be speculative or excessive). In light of Socha's testimony at the restitution hearing, the trial court's subsequent order did not direct B.D.G. to pay "restitution" in any sense of that word's plain and ordinary meaning. Socha's testimony failed to establish that the $26,635 in medical expenses *exceeded* the amount of the settlement award or that the settlement award was otherwise insufficient to cover these expenses. Socha's testimony instead established that she sought $26,635 in medical expenses because DPW subrogated this amount *from* her settlement award. Upon my review of the record, I conclude that there is no evidence to support a finding that at the time of the restitution hearing, Socha sustained a *loss* or *damage* for medical expenses in the amount of $26,635.

¶ 13 Here, the record indicates that out of the $26,635 in medical expenses, Socha did not suffer an out-of-pocket loss in the form of expenses paid, nor was she indebted with an outstanding legal obligation. DPW paid Socha's medical expenses, and after Socha received her settlement amount, DPW was fully reimbursed and its subrogation rights satisfied. Therefore, any payment made by B.D.G. pursuant to the trial court's restitution order would run to the sole benefit of Socha. This benefit, in turn, goes beyond restoring Socha to her original position prior to injury and confers upon her monies to which she was not legally entitled. Stated another way, when Socha received her settlement award and DPW was reimbursed in full for paying Socha's medical expenses, Socha was restored to her original position, because in the absence of the accident, she would not have incurred such expenses. Socha, however, was not thereafter entitled to an additional $26,635 in "medical expenses" for her own, unconditional use.[5] Quite simply, Socha's testimony at the restitution hearing established that she was already "made whole" in regards to these expenses.

¶ 14 Based upon this record, the trial court's restitution order had the effect of unjustly enriching Socha, by allowing her, for all intents and purposes, to receive double recovery for the same medical expenses. Consequently, under the facts of this case, Socha will receive money in excess of the actual damages caused by B.D.G.; *i.e.*, as a result of B.D.G.'s conduct, Socha incurred medical *expenses* which are now converted into a measure of *income*. Given the express language of 42 Pa.C.S. § 6352(a)(5), which only permits the imposition of "a reasonable amount of restitution," I conclude that the trial court lacked the statutory authority necessary to enter an order resulting in the double recovery of expenses and the unjust enrichment of Socha. On this basis, the trial court imposed an illegal sentence and its order granting $26,635 in restitution must be vacated.

¶ 15 My reading of 42 Pa.C.S. § 6352(a)(5) is buttressed by another statutory provision related to restitution. Although not at issue in this case, the mandatory restitution statute for criminal

---

5. Indeed, B.D.G. was obligated to compensate Socha for her medical expenses even though DPW originally paid these expenses. *See Boudwin v. Yellow Cab Company*, 410 Pa. 31, 188 A.2d 259 (1963); *Beechwoods Flying Service, Inc. v. Al Hamilton Contracting Corp.*, 504 Pa. 618, 476 A.2d 350, 352 (1984) (stating that "the 'collateral source' rule was intended to avoid precluding a claimant from obtaining redress for his or her injury merely because coverage for the injury was provided by some collateral source, e.g. insurance."). However, after DPW's subrogation rights were satisfied, any further payment to Socha for the same medical expenses constitutes "double dipping."

convictions, 18 Pa.C.S. § 1106(g), sheds light on this matter. In relevant part, 18 Pa.C.S. § 1106(g) states that a restitution order shall not debar a victim from later filing a civil suit "provided that any civil award *shall be reduced by the amount paid under the criminal judgment.*" 18 Pa.C.S. § 1106(g) (emphasis added). Ultimately, I believe that 18 Pa.C.S. § 1106(g) evidences our legislature's clear intent that a victim of a crime should not obtain a monetary windfall and receive double recovery/duplicative damages through the operation of our civil and criminal justice systems. In interpreting a restitution provision similar to 18 Pa. C.S. § 1106(g), the Supreme Court of Florida observed:

> [W]e note that section 775.089(8) contemplates the coexistence of criminal restitution and a civil recovery. The statute provides that the amount of restitution shall be set off against any civil recovery, reflecting the Legislature's recognition that although the restitution obligation is primary, the victim should not receive a double recovery. Although section 775.089(8) assumes that restitution will precede a civil recovery ... the sequence is not determinative.... [T]he purpose of the statute is clear [ ]: to prevent the victim from forcing the defendant to pay twice....

*Kirby v. State,* 863 So.2d 238, 243 (Fla. 2003); *see* Fla. Stat. § 775.089(1)(a)(8) ("... An order of restitution hereunder will not bar any subsequent civil remedy or recovery, but the amount of such restitution shall be set off against any subsequent independent civil recovery."). Therefore, in order to avoid an award of duplicative damages, I conclude that a civil settlement must be taken into consideration when determining the items, expenses, and amount of restitution to be paid under 42 Pa.C.S. § 6352(a)(5). *See Kirby* 863 So.2d at 244–45 (stating that in

order to prevent double recovery, a civil settlement is a relevant factor in determining the amount of restitution). Since DPW paid Socha's medical expenses and was reimbursed by subrogating its expenditure from Socha's settlement award, any legal obligations in connection to these medical expenses were satisfied and/or extinguished. Taking into account Socha's settlement award, the record demonstrated that B.D.G. paid Socha's medical expenses in the amount of $26,635, and the trial court, by ordering B.D.G. to pay an additional $26,635, essentially compelled B.D.G. to pay Socha twice for the same medical expenses.

¶ 16 In light of the foregoing, I conclude that our legislature never intended the phrase, "a reasonable amount of restitution," be interpreted as granting the trial court with the power, or means by which, to award a victim $53,270 in medical expense damages when that victim only incurred $26,635 in medical expenses. Because the trial court's order awarded Socha double recovery for the same medical expenses, I conclude that the trial court transcended its statutory authority to order "a reasonable amount of restitution" under 42 Pa.C.S. § 6352(a)(5). *See, e.g., U.S. v. Parsons,* 141 F.3d 386, 393 (1st Cir.1998) (stating that a prior civil settlement will bar criminal restitution where there is indication that the settlement compensated the victim for a loss and the restitution order would result in double recovery); *People v. Hoisington,* 902 P.2d 887, 888 (Colo.App.1995) (stating that "while restitution is not intended as a substitute for a civil damages action, funds recovered by the victim in a civil proceeding prior to ... the award of restitution must be offset as required by [statute.]"). *Cf., e.g., State v. Applegate,* 266 Kan. 1072, 976 P.2d 936, 941 (1999) (concluding that trial court did not abuse

its discretion in finding that a civil settlement fully compensated the victim's losses and thus precluded the imposition of criminal restitution); *State v. Howard*, 163 Ariz. 47, 785 P.2d 1235, 1239 (App.1989) (affirming the trial court's decision to reduce the amount of criminal restitution in view of a civil settlement because the purpose of restitution is to "make the victim whole, not to punish."). The trial court, consequently, imposed an illegal sentence and I would vacate its dispositional order to the extent that it directed B.D.G. to pay $26,635 for medical expenses that DPW subrogated from Socha's settlement award. In reaching my conclusion, I emphasize that besides restitution, there are a variety of alternatives that the trial court could employ in its dispositional order to aid in B.D.G.'s rehabilitation. *See* 42 Pa.C.S. § 6352(a)(1)-(6).

¶ 17 The Majority cites *In re B.T.C.*, 868 A.2d 1203 (Pa.Super.2005), to support its conclusion that the trial court lawfully ordered B.D.G. to make restitution to Socha for medical expenses in the amount of $26,635. Majority Opinion and 371–72. In that case, a panel of this Court, relying exclusively on *Commonwealth v. Kerr*, 298 Pa.Super. 257, 444 A.2d 758 (1982), concluded that a trial court can order a juvenile to make restitution to a family for funeral expenses, despite the fact that the juvenile's insurance company previously paid these expenses. *In re B.T.C.*, 868 A.2d at 1205–06. I find that *In re B.T.C.* was erroneously decided and would over-

rule that case for two fundamental reasons.

¶ 18 First, *In re B.T.C.* misapprehended *Kerr* since that case merely stands for the proposition that payments made to a victim from the *victim's* own insurance company cannot be credited in determining the amount of restitution. *Kerr*, 444 A.2d at 760. Thus, at its broadest interpretation, *Kerr* allows an order of restitution to encompass the subrogation rights of the *victim's* insurer where the insurer pays the victim for a loss under an insurance contract.[6] *See id.; Commonwealth v. Mathis*, 317 Pa.Super. 362, 464 A.2d 362, 367–68 (1983) ("*Kerr* raised the propriety of a restitution order where an insurance carrier stood to benefit through subrogation."). *Kerr* does not mention, let alone suggest, that a victim is entitled to "double dip" his/her damages and receive duplicative payments on the same item or expense *after* the victim's insurance carrier fulfills its subrogation rights. Consequently, *In re B.T.C.* is without a legal foundation and its holding expands *Kerr's* doctrine to an unprecedented area of this Court's jurisprudence. Second, *In re B.T.C.* expressly endorsed an order of restitution that was "duplicative of monies already paid to the victim's family through a civil settlement" and implicitly approved of a theory of unjust enrichment as part of a juvenile's restitution order. *Id.* at 1206. For the reasons stated *supra*, I conclude that *In re B.T.C.'s* holding is in direct contravention to the plain language of 42 Pa.C.S. § 6352(a)(5), which only provides for "a

6. On this note, *Kerr* simply enforces the rule "that damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance[.]" *Boudwin*, 188 A.2d at 260 (citation omitted). *See supra* n. 3. The Majority's reliance on 18 Pa.C.S. § 1106(c)(1)(i) is similarly misplaced, because this statutory section, in essence, codifies *Kerr's* holding but adds the requirement that

the defendant pay the victim's insurance company instead of the victim directly. Majority Opinion at 371–72. *See* 18 Pa.C.S. § 1106(c)(1)(i) ("The court shall not reduce a restitution award by any amount that the victim has received from an insurance company *but shall order the defendant to pay any restitution ordered for loss previously compensated by an insurance company to the insurance company.*") (emphasis added).

reasonable amount of restitution." Therefore, since *In re B.T.C.* is incompatible with 42 Pa.C.S. § 6352(a)(5), I would overrule that case insofar as it holds that a trial court is vested with the statutory authority to award duplicative recovery.

¶ 19 For the above-stated reasons, I conclude that 42 Pa.C.S. § 6352(a)(5) does not authorize a trial court to order restitution to a victim for medical expenses, where DPW originally paid the expenses and later subrogated the amount owed from the victim's settlement award. As such, I would vacate the trial court's order to the extent that it directed B.D.G. to pay $26,635 in medical expenses, concluding that this portion of the order constituted an illegal sentence. I am unable to subscribe to the Majority's reasoning on this issue. Hence, I respectfully dissent.

¶ 20 BENDER, BOWES, PANELLA, JJ., Join.